IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**GERALD LEE EATON, SR.**                    *

                                          *

**v.**                    *    **Civil No. JKS–11-2497**

                                          *

**MICHAEL J. ASTRUE**                    *

**Commissioner of Social Security**                    *

## MEMORANDUM OPINION

Plaintiff Gerald Lee Eaton, Sr. brought this action pursuant to 42 U.S.C. § 405(g) for review of a final administrative decision of the Commissioner of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) under the Social Security Act, 41 U.S.C. §§ 401–433 (the Act).  The parties' cross-motions for summary judgment and Eaton's motion for judgment (ECF Nos. 14 and 15)[1] are ready for resolution and no hearing is deemed necessary.  *See* Local Rule 105.6.  For the reasons set forth below, Eaton's motions for summary judgment and remand will be denied, and the Commissioner's motion for summary judgment will be granted.

### I.   Background.

Eaton protectively applied for Social Security Disability Insurance (SSDI) benefits on May 5, 2008 alleging onset of his disability on October 30, 2007.  (R. 21).  His application was denied initially (R. 21, 70, 74–77) and upon reconsideration.  (R. 21, 71, 79–80).  An Administrative Law Judge (ALJ) held a hearing on September 30, 2009, at which Eaton was represented by counsel.  (R. 21, 34–69).  On April 30, 2010, the ALJ found that Eaton was not disabled within the meaning of the Act (R. 18–28), and on July 7, 2011 the Appeals Council

---

[1] It will be assumed that Eaton seeks summary judgment and, in the alternative, remand.  Eaton submitted a Motion for Judgment on the Pleadings (ECF No. 13) and seeks remand for calculation of benefits or, alternatively, for a new hearing (ECF No. 14 at 14).

denied his request for review.  (R. 1–4).  Thus, the ALJ's determination became the Commissioner's final decision.

## II.   ALJ's Decision.

The ALJ evaluated Eaton's claim using the five–step sequential process set forth in 20 C.F.R. § 404.1520.  First, the ALJ determined that Eaton had not engaged in substantial gainful activity since October 30, 2007, the alleged onset date.  (R. 23).  At step two, the ALJ concluded that Eaton suffers from the following severe impairments: coronary artery disease (with stent placement in 2002) and hypertension.[2]  (R. 23–24).  At step three, the ALJ determined that Eaton does not have an impairment or combination of impairments that meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 24).  Further, the ALJ found that Eaton has the Residual Functional Capacity (RFC) to perform light work,[3] except that he can only occasionally climb ramps, stairs, ladders, ropes, or scaffolds.  (R. 24–27).  At step four, the ALJ found that Eaton was capable of performing past relevant work as a security guard (as actually and generally performed) or auto parts driver (as he actually performed it).  (R. 27).  As a result, the ALJ determined that Eaton was not disabled within the meaning of the Act, at any time from his alleged onset date through the date of the decision.  (R. 27–28).

---

[2] The ALJ determined that Eaton's left-sided Bell's palsy, benign prostatic hypertrophy, and hypercholesterolemia were not severe impairments because they did not more than minimally affect Eaton's ability to perform basic work activities.  (R. 23–24). The ALJ also determined that, although Eaton's primary care provider stated that Eaton's anxiety could worsen his symptoms, Eaton had never been diagnosed or treated for anxiety and therefore anxiety was not a medically determinable impairment.  (R. 24).

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b)

### III.     Standard of Review.

The role of this court on review is to determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standards. 42 U.S.C. § 405(g); *Pass v. Chater*, 65 F.3d 1200, 1202 (4th Cir. 1995). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is more than a scintilla, but less than a preponderance, of the evidence presented. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). It is such evidence that a reasonable mind might accept to support a conclusion, and must be sufficient to justify a refusal to direct a verdict if the case were before a jury. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). This court cannot try the case *de novo* or resolve evidentiary conflicts, but rather must affirm a decision when it is supported by substantial evidence. *Id.*

### IV.     Discussion

Eaton raises three broad issues on appeal. First, Eaton claims that the ALJ improperly weighed the medical opinion evidence. Second, Eaton claims that the ALJ improperly evaluated Eaton's credibility. Lastly, Eaton claims that the ALJ relied upon flawed vocational expert (VE) testimony.

#### A.  The ALJ Properly Evaluated the Medical Opinion Evidence

Eaton claims that the ALJ provided insufficient analysis regarding the weight given to the treating physician's opinions. Eaton also claims that the ALJ gave undue weight to the opinion of a one-time consultative examiner who failed to review relevant medical evidence. Finally, Eaton claims that the ALJ gave undue weight to the opinions of a non-examining State agency physician.

**1. Treating Physician's Opinion**

When analyzing the nature and severity of the claimant's alleged impairments, the ALJ must give controlling weight to a medical opinion by a treating source that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the applicant's] case record." 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2); *see also* SSR 96-5P, 1996 WL 374183, at *2 (July 2, 1996); SSR 96–8P, 1996 WL 374184, at *7 (July 2, 1996). However, the ALJ may accord "significantly less weight" to a treating source's medical opinion that is not well-supported or is inconsistent with substantial evidence. *Craig. v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996); *see also Baker v. Chater*, 957 F. Supp. 75, 80 (D. Md. 1996).

The ALJ need not give controlling weight to treating source opinions on issues reserved to the Commissioner, such as: the scope of the claimant's RFC, whether the claimant's RFC prevents him from doing past relevant work, and whether the claimant is "disabled" within the meaning of the Act. 20 C.F.R. §§ 404.1527(e) and 416.927(e); SSR 96-5P, at *1–3. However, the ALJ must explain the consideration given to the treating source's opinions about issues reserved to the Commissioner and evaluate all of the evidence in the record to determine whether the opinion is supported by the record. *Thomas v. Astrue*, PWG-09-2497, 2012 WL 1100660, at *2 (D. Md. Mar. 30, 2012); SSR 96-5P, at *1–3.

The exact weight owed to non-controlling medical opinions depends on: (1) whether the source has examined the applicant; (2) the treatment relationship between the source and the applicant; (3) the supportability of the opinion; (4) the consistency of the opinion with the record; and (5) whether the source is a specialist. 20 C.F.R. §§ 404.1527(d) and 416.927(d); SSR 96-5P, at *3; *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006); *Johnson v. Barnhart*,

434 F.3d 650, 654 (4th Cir. 2005).  The adjudicator need not "apply the factors in mechanical

fashion" nor engage in "rigid analysis."  *Carter v. Astrue*, CIV.A. CBD-10-1882, 2011 WL

3273060, at *6 (D. Md. July 27, 2011).  The adjudicator's analysis is sufficient if it includes

"specific reasons for the weight given to the treating source's medical opinion, supported by the

evidence in the case record, and [is] sufficiently specific to make clear to any subsequent

reviewers the weight the adjudicator gave to the treating source's medical opinion and the

reasons for that weight."  SSR 96-2P, 1996 WL 374188, at *5 (July 2, 1996).

  In the present case, the ALJ rejected Dr. Thomas Biondo's opinion in the July 14, 2009

Multiple Impairment Questionnaire[4] because it was internally inconsistent, inconsistent with Dr.

Biondo's own treatment notes, and inconsistent with the record as a whole.  (R. 26–27).  Though

the ALJ gave Dr. Biondo opportunities to explain such inconsistencies, Dr. Biondo failed to do

so.  (R. 21).  The ALJ considered the contrast between Dr. Biondo's assurance that Eaton could

do a full-time competitive job that required him to keep his neck in a constant position (such as a

job requiring Eaton to monitor computer screens) and Dr. Biondo's assertions that Eaton could

only sit for one hour and stand/walk up to an hour per day.  (R. 27; R. 211, 214; R. 347, 349).

The ALJ also noted that Dr. Biondo initially checked boxes indicating that Eaton had

"significant limitations" in repetitive reaching, handling, fingering, or lifting, but Dr. Biondo

later opined that Eaton had "no limitations" in using his upper extremities to grasp, turn, or twist

objects or using his fingers or hands for fine manipulations and Eaton had only "minimal

---

[4] Though the ALJ primarily discussed Dr. Biondo's opinions in a Multiple Impairment Questionnaire (R. 209–16, 345–52), Dr. Biondo also completed a Cardiac Impairment Questionnaire (R. 510–15).  Limitations listed in the Cardiac Impairment Questionnaire included: inability to stand/walk or sit more than an hour during an eight-hour work day, inability to lift or carry any weight frequently or more than twenty pounds occasionally, and disruptions in concentration and attention due to pain and fatigue.

limitations" in using his arms for reaching during a competitive, eight-hour work day.[5]  (R. 26–27; R. 212–13, 348–49).

Though Dr. Biondo indicated that he based his opinions on symptoms and clinical findings[6] of chest pain, shortness of breath, dyspnea on exertion, edema, nausea, palpitations, fatigue, and blurred vision, his treatment records provide little corroboration.  (R. 27; R. 345–46, 510–11).  Dr. Biondo's treatment records from August 2008 to September 2009 indicated that Eaton lacked chest pain and had little to no shortness of breath (R. 516, 518, 521–25, 537–39).  The treatment records only occasionally noted dyspnea on exertion.  (R. 523, 538).

The record as a whole also conflicts with Dr. Biondo's clinical findings and opinions.  Objective contrary evidence included a July 2, 2009 nuclear test report,[7] revealing some dyspnea on exertion but no evidence of heart arrhythmias, ischemia,[8] or chest pain.  (R. 26; R. 550).  The nuclear test report indicated normal function and normal blood pressure.  (*Id.*).  Additional

---

[5] While not discussed by the ALJ, Dr. Biondo's opinions contain further internal inconsistencies. For example, in the July 2009 Multiple Impairment Questionnaire, Dr. Biondo checked a box indicating that Eaton's impairments were not likely to produce good days and bad days (R. 215, 351), but in September 2009 he checked a box on a Cardiac Impairment Questionnaire (R. 513) stating the opposite.

[6] The ALJ identified Eaton's severe impairments as coronary artery disease (CAD) and hypertension.  (R. 23–24).  Signs and symptoms of CAD include: chest pain, shortness of breath, and heart attack. *Coronary Artery Disease: Symptoms*, MAYOCLINIC.COM, http://www.mayoclinic.com/health/coronary-artery-disease/DS00064/DSECTION=symptoms (last visited Aug, 2, 2012).  Patients with high blood pressure (hypertension) often have no signs and symptoms, but patients with severe hypertension may experience headaches, nosebleeds, and dizziness. *High Blood Pressure (Hypertension): Symptoms*, MAYOCLINIC.COM, http://www.mayoclinic.com/health/high-blood-pressure/DS00100/DSECTION=symptoms (last visited Aug, 2, 2012).  Uncontrolled CAD and hypertension may lead to complications such as heart failure, heart attack, and abnormal heart rhythm (arrhythmia). *Coronary Artery Disease: Complications*, MAYOCLINIC.COM, http://www.mayoclinic.com/health/coronary-artery-disease/DS00064/DSECTION=complications (last visited Aug, 2, 2012); *High Blood Pressure (Hypertension): Complications*, MAYOCLINIC.COM, http://www.mayoclinic.com/health/high-blood-pressure/DS00100/DSECTION=complications (last visited Aug, 2, 2012).  Signs and symptoms of heart failure include: shortness of breath (dyspnea) on exertion, fatigue and weakness, swelling (edema) in legs, ankles, and feet, rapid or irregular heart beat (palpitations), chest pain (angina), persistent cough or wheezing, nausea and reduced ability to exercise. *Heart Failure: Symptoms*, MAYOCLINIC.COM, http://www.mayoclinic.com/health/heart-failure/DS00061/DSECTION=symptoms (last visited Aug, 2, 2012).

[7] A nuclear stress test measures blood flow to the heart at rest and during stress on the heart. *Nuclear Stress Test: Definition*, MAYOCLINIC.COM, http://www.mayoclinic.com/health/nuclear-stress-test/MY00994 (last visited Aug, 2, 2012).

[8] Myocardial ischemia occurs when blockages in the heart's arteries (coronary arteries) reduce blood flow to the heart muscle. *Myocardial Ischemia: Definition*, MAYOCLINIC.COM, http://www.mayoclinic.com/health/myocardial-ischemia/DS01179 (last visited Aug, 2, 2012).

objective evidence included a February 15, 2009 chest x-ray from Hartford Memorial Hospital,

indicating no acute cardiopulmonary disease, no change from a previous x-ray, and only minor

elevation of the right hemidiaphragm.  (R. 26; R. 362).  Other contrary evidence included

treatment notes and letters from Eaton's cardiologists, Dr. Jay Lang and Dr. Niteen Milak.  In a

letter dated March 21, 2007, Dr. Milak noted that Eaton had no chest pain, no shortness of

breath, regular heart rate and rhythm, and only minimal dyspnea on exertion.  (R. 26; R. 333,

381).  In a letter dated May 20, 2009, Dr. Milak reiterated that Eaton had normal heart rate and

no chest pain.  (R. 26; R. 526).   While Milak acknowledged that Eaton sought emergency

treatment for palpitations in February 2009,[9] those palpitations disappeared after Eaton heeded

his doctor's advice and stopped drinking ten root beers a day.  (R. 26; R. 526).  On June 11,

2008, Dr. Lang noted that Eaton had no complaints of chest pain or shortness of breath.  A

physical exam revealed no edema and normal cardiac function.  (R. 26; R. 235, 264, 328, 405,

438).  The same day, Drs. Ries and Shaukat confirmed that Eaton did not have chest pain, heart

palpitations, heart murmurs,[10] blurred vision, dizziness, or shortness of breath.  (R. 226–34, 256–

58, 396–404, 430–37).  A July 8, 2008 consultative exam revealed some high blood pressure but

regular heart rate and no chest pain, edema or angina.  (R. 25; R. 307–12).  In sum, substantial

evidence supports the ALJ's conclusion that Dr. Biondo's opinion was inconsistent, not well-

supported, and did not merit controlling weight under the treating physician rule.  *See Craig*, 76

F.3d at 590.

As Dr. Biondo's opinion did not merit controlling weight, the ALJ appropriately

proceeded to weigh the opinion according to: (1) whether the source has examined the applicant;

---

[9] While not discussed by the ALJ, nursing records from Eaton's February 15, 2009 hospitalization indicate that Eaton had no chest pain and his breath sounded clear.  (R. 366, 495).

[10] Heart murmurs are abnormal sounds during the heartbeat cycle made by turbulent blood in or near the heart. *Heart Murmurs: Definition*, MAYOCLINIC.COM, http://www.mayoclinic.com/health/heart-murmurs/DS00727 (last visited Aug, 2, 2012).

(2) the treatment relationship between the source and the applicant; (3) the supportability of the opinion; (4) the consistency of the opinion with the record; and (5) whether the source is a specialist.  20 C.F.R. §§ 404.1527 and 416.927.  As previously stated, the ALJ considered the supportability of the opinion and the consistency of the opinion with the record.  The ALJ also examined the treatment relationship, noting that Dr. Biondo had treated Eaton since August 5, 2002 for coronary artery disease, hypertension and hyperlipidemia.  (R. 26).  The ALJ's references to Dr. Biondo's treatment notes implicitly acknowledged that Dr. Biondo had examined Eaton.  Lastly, the ALJ's decision and Eaton's Motion characterized Dr. Biondo as a primary care physician who coordinated Eaton's care with cardiac specialists.  (R. 26).  As in *Carter,* the ALJ did not need to undergo "rigid analysis" of the five regulatory factors; it was sufficient for the ALJ to provide specific reasons and supporting evidence for the weight given to the treating physician's opinion.  *See* 2011 WL 3273060, at *6; SSR 96-2P, at *5.  As such, the ALJ provided sufficient analysis and substantial evidence to support the weight given to Dr. Biondo's opinion.

### 2.  Opinion of One-Time Consultative Examiner

Eaton further claims that the ALJ improperly relied on Dr. William Barrish's July 8, 2008 opinion (R. 307–12) that Eaton could perform light exertional work.  Dr. Barrish indicated that Eaton could sit, stand, and walk eight hours per day, lift and carry fifteen pounds frequently, lift thirty pounds occasionally and exhibit a full range of strength and motion.  (R. 309).  The ALJ gave Dr. Barrish's opinion "great weight" because it was "consistent with the record as a whole." (R. 26).  Eaton claims that the ALJ unduly relied on Dr. Barrish's opinion given that Dr. Barrish did not review Eaton's medical records, including MRI findings, and it was unclear whether Dr. Barrish had training in evaluating cardiovascular conditions.

The regulations require that a consultative examiner be given "any necessary background information about [the claimant's] condition." 20 C.F.R. §§ 404.1517 and 416.917.  The Agency's Program Operations Manual System (POMS) suggests that "necessary background information" may include: medical evidence of record, recently completed SSA disability reports, SSA forms completed by the claimant, and communications from Disability Determination Consultants.   SSA, *DI 22510.017: Consultative Examination Appointment Notice*, PROGRAM OPERATIONS MANUAL SYS. (Feb. 14, 2012), *available at* https://secure.ssa.gov/poms.nsf/lnx/0422510017.  The Agency's Hearings, Appeals and Litigation Law Manual (HALLEX) instructs the ALJ or hearing office staff to accompany requests for consultative exams with a medical exhibits folder containing evidence "relating to the type of examination ordered."  SSA, *I-2-5-20 Consultative Examinations and Tests*, HEARINGS, APPEALS & LITIG. MANUAL (Aug. 28, 2005), *available at* http://www.ssa.gov/OP_Home/hallex/I-02/I-2-5-20.html.  HALLEX specifies that each medical exhibits folder should contain "legible copies of the material and relevant evidence identified by the ALJ as related to the type of examination ordered along with the most recently completed disability report form," but  "[m]aterial that is not relevant to the type of examination ordered should not be included."  SSA, *I-2-5-22 Medical Exhibits Folder*, HEARINGS, APPEALS & LITIG. MANUAL (Aug. 28, 2005), http://www.ssa.gov/OP_Home/hallex/I-02/I-2-5-22.html.

In this case, Eaton identifies only his MRI as a necessary record not provided.  It is not apparent why an MRI preformed on June 11, 2008 (R. 270), indicating that Eaton's brain is "essentially normal" for a person of his age, was relevant or necessary background information for Dr. Barrish's consultative exam.  Accordingly, this Court will not disturb the weight given to Dr. Barrish's opinions on the ground that he did not examine Eaton's MRI.

Also without merit is Eaton's contention that Dr. Barrish's opinion must be discounted because Dr. Barrish specialized in physical medicine and rehabilitation instead of cardiology. The regulations only require that a consultative examination be performed by "a qualified medical source," meaning that the medical source must be currently licensed and have training and experience to perform the type of examination or test requested.  20 C.F.R. § 404.1519g. There is no requirement that the medical source be qualified in a specific medical specialty and there is no evidence that this consultative examiner in this case lacked the training and experience to perform the requested examination.

### 3.   Opinion of the Non-Examining State Agency Physician

Eaton claims that the ALJ erred in relying on the opinions of the non-examining State Agency review physician, Dr. J. Biddison.  (R. 337–44).  The ALJ afforded Dr. Biddison's RFC assessment "great weight" as it was "consistent with the record as a whole."  (R. 25).  Dr. Biddison found that Eaton could lift twenty pounds occasionally and ten pounds frequently, stand and/or walk six hours in an eight-hour work-day, sit for six hours in an eight-hour day, and perform unlimited pushing and pulling.  (R. 338).  Dr. Biddison also concluded that Eaton could occasionally climb and could frequently, balance, stoop, kneel, crouch, and crawl.  (R. 339). Eaton contends that the ALJ improperly relied on Dr. Biddison's opinion since Dr. Biddison only cited two physician progress notes and Dr. Barrish's evaluation in support of his conclusions. (R. 338, 343).  The first note, dated December 5, 2008, served as evidence of Eaton's non-compliance. (R. 326; R. 338).  Dr. Biddison also cited a note from Dr. Biondo, dated October 10, 2008 (R. 322) as evidence that Eaton felt okay, had blood pressure of 148/70, and still had some sensation relating to Bell's Palsy.  (R. 338).

The opinion of a non-examining, non-treating physician can be relied upon when consistent with the record, but "cannot, by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by *all of the other* evidence in the record." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986) (emphasis in original); *Martin v. Sec'y Dep't Health, Educ. & Welfare*, 492 F.2d 905, 908 (4th Cir. 1974); *see also Gordon v. Schweiker,* 725 F.2d 231, 235 (4th Cir. 1984). If the medical testimony from examining or treating physicians goes both ways, an ALJ's determination that agrees with the non-examining physician's opinion should stand, if the ALJ states what weight was given to the evidence. *Gordon,* 725 F.2d at 235; *see also Wittler v. Shalala*, 1995 U.S. App. LEXIS 2111, at *8 (4th Cir. Feb. 2, 1995).

In this case, the ALJ gave proper weight to Dr. Biddison's opinion. The ALJ did not need to discount Dr. Biddison's opinion because it was amply supported by medical evidence of record. Contrary to Eaton's assertions, Dr. Biddison's opinion did not stand alone and Dr. Biddison did not limit his consideration of the evidence to only two physician progress notes and Dr. Barrish's report. Dr. Biddison listed the notes as "additional" medical evidence of record. (R. 338). Dr. Biddison did not indicate that he relied solely upon the two progress notes and seemed to incorporate, by reference, other evidence included in Eaton's prior assessment and consultative exam. For example, Dr. Biddison noted that Eaton did not allege a worsening of his high cholesterol, cardiovascular disease, or coronary artery disease since the initial RFC assessment (R. 313–20) rendered by Dr. E. Nakhuda on July 17, 2008. (R. 338). The initial RFC mentioned in Dr. Biddison's assessment, incorporated a referral letter from Dr. Milak to Dr. Biondo  (R. 333–34, 381–82), a progress note from Mid-Atlantic Cardiovascular Associates dated March 12, 2008 (R. 331), and Dr. Barrish's consultative exam report from July 8, 2008 (R.

11

307–12).  This evidence indicated that Eaton had regular heart rate and rhythm, clear lungs with

no wheezes, no edema, and a normal EKG.[11]  Like Dr. Nakhuda, Dr. Biddison indicated that he

viewed Dr. Barrish's consultative exam report, which included a physical exam and a detailed

report on Eaton's range of motion.  (R. 343, R. 307–12).  In most respects, Dr. Biddison's RFC

assessment mirrored the initial assessment and included more limitations than Dr. Barrish's

consultative exam.[12]  (*Compare* R. 337–44 *with* R. 307–12 and 313–20).  The ALJ could

properly conclude that Dr. Biddison's report was consistent with substantial medical evidence of

record.

### B.  The ALJ Properly Evaluated Eaton's Credibility

Eaton argues that the ALJ "applied the incorrect legal standard in weighing Mr. Eaton's

credibility by comparing the severity of his allegations against a pre-determined residual

functional capacity rather than the other way around."  (ECF No. 14 at 11).  Eaton also claims

that the ALJ placed undue emphasis on: (1) Eaton's failure to report his symptoms to Dr.

Biondo; (2) ability to do household chores; and (3) failure to pursue regular medical treatment,

when he determined that Eaton's testimony regarding the severity of his limitations was

inconsistent with the medical evidence of record.  (ECF No. 14 at 12–13).

The ALJ must follow a two-step process to assess the claimant's subjective statements

about the severity and limiting effects of his symptoms.  20 C.F.R. §§ 404.1529(a) and

---

[11] An electrocardiogram (EKG) records electrical signals as they travel through the heart.  *Electrocardiogram (ECG or EKG): Definition*, MAYOCLINIC.COM, http://www.mayoclinic.com/health/electrocardiogram/MY00086 (last visited Aug, 2, 2012).

[12] Like Dr. Biddison, Dr. Nakhuda found that Eaton could lift twenty pounds occasionally and ten pounds frequently, stand and/or walk six hours in an eight-hour work-day, sit for six hours in an eight-hour day, perform unlimited pushing and pulling, and climb occasionally.  (R. 314–15).  However, Dr. Nakhuda found that Eaton could only balance, stoop, and kneel, crouch, and crawl occasionally (R. 315), whereas Dr. Biddison found that Eaton could perform those activities frequently (R. 339).  Dr. Barrish indicated that Eaton could sit, stand and walk eight hours per day, lift fifteen pounds frequently, and lift thirty pounds occasionally. (R. 309).

416.929(a); *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996).[13]  At the first step, the ALJ must determine whether the claimant has shown, by objective medical evidence, a medical impairment reasonably likely to cause the pain alleged.  20 C.F.R. §§ 404.1529(b) and 416.929(b); *Craig*, 76 F.3d at 594.  If the claimant makes this threshold showing, the ALJ must then evaluate the intensity and persistence of the claimant's symptoms and whether the symptoms affect the claimant's capacity to work.  20 C.F.R. §§ 404.1529(c) and 416.929(c); *Craig*, 76 F.3d at 595.

If the individual's statements about the intensity, persistence, or functionally limiting effects of the symptoms are not substantiated by objective medical evidence, the ALJ must consider the entire case record, including: (1) claimant's statements about his pain; (2) claimant's medical history; (3) laboratory findings; (4) any objective medical evidence of pain; (5) claimant's daily activities; and (6) medical treatment to alleviate pain.  20 C.F.R. §§ 404.1529(c)(1) to (3) and 416.929(c)(1) to (3); *Craig,* 76 F.3d at 595; SSR 96-7P, 1996 WL 374186, at * 3 (July 2, 1996).  The claimant's allegations of pain need only be accepted to the extent they are consistent with the available evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4); *Hines*, 453 F.3d at 565 n.3; *Craig,* 76 F.3d at 595; SSR 96-7P, at *4.

If the ALJ discredits the claimant's testimony, he must provide "specific reasons for the finding on credibility, supported by the evidence" and the determination "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7P, at * 4.  The ALJ's credibility determination is generally entitled to great weight, given the ALJ's unique opportunity to observe the claimant and judge his or her subjective complaints.  *Shively*, 739 F.2d at 989–90.  Because credibility determinations are peculiarly within the province of the

---

[13] The Fourth Circuit has consistently identified the *Craig* two-step process as the proper framework for making credibility determinations in DIB and SSI cases.  *See, e.g,. Fisher v. Barnhart*, 181 F. App'x 359, 363 (4th Cir. 2006); *Hines*, 453 F.3d at 565; *Johnson*, 434 F.3d at 657–59.

ALJ, a reviewing court will not upset credibility determinations supported by substantial evidence. *See e.g. Id.*; *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994); *Hays*, 907 F.2d at 1456.

Here, the ALJ found that Eaton satisfied the first part of the *Craig* inquiry because he suffered from multiple medically determinable impairments that could produce the pain alleged. (R. 25). However, at step two of the *Craig* evaluation, the ALJ found that "the claimant's testimony is not fully credible" regarding the intensity, persistence and limiting effects of the pain. (R. 25). Eaton's alleged symptoms included: constant shortness of breath and chest pain, heart palpitations, inability to walk more than a block without resting, fatigue, blurred vision, and dizziness upon prolonged standing. (R. 25; R. 46–64). Ultimately, the ALJ based his credibility determination on: (1) the inconsistency between Eaton's testimony and the medical evidence of record; (2) Eaton's activities of daily living; and (3) Eaton's non-compliance with medical treatment. (R. 25). Substantial evidence supports the ALJ's determination that Eaton's testimony was not fully credible.

### 1. Failure to Report Symptoms

At the hearing, Eaton identified shortness of breath as one of the conditions limiting his RFC. Eaton testified that he became short of breath all the time and that daily activities— including talking on the telephone, sitting, and walking to the bathroom—triggered shortness of breath, tingling sensations, and heart palpitations. (R. 25; R. 48–51). The ALJ acknowledged that Eaton sometimes reported shortness of breath and chest pain during medical exams, but he ultimately determined that the "frequency with which [Eaton] specifically denies shortness of breath and chest pain when being examined by a physician is inconsistent with testimony that he has shortness of breath all the time, even while sitting." (R. 25).

The regulations specifically authorize the ALJ to consider whether a claimant's alleged symptoms, including pain, are consistent with the claimant's medical history, medical signs, and laboratory findings.  20 C.F.R. §§ 404.1529(a) and (c)(3), 416.929(a) and (c)(3).  The ALJ need only factor the claimant's purported symptoms into the RFC to the extent that the symptoms and associated functional limitations "can reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

As previously discussed, substantial medical evidence contradicts Eaton's testimony that he was short of breath all the time.  (R. 48).  For instance, the 2007 letter from Dr. Milak, the June 2008 treatment note from Dr. Lang, emergency room notes from Dr. Ries and Dr. Shaukat, and the 2009 Nuclear Test Report all noted that Eaton had neither chest pain nor shortness of breath.  While Dr. Biondo's records from 2009 do note some dyspnea on exertion, the notes largely indicate that Eaton had no chest pain or shortness of breath.  While Eaton argues that he did not need to report shortness of breath at every doctor's visit in order to substantiate the symptoms associated with coronary artery disease and hypertension, the ALJ reasonably expected that the medical evidence would substantiate Eaton's testimony that he was short of breath all the time.  (R. 48–49).

## 2.  Activities of Daily Living

The ALJ determined that Eaton's activities of daily living did not support the degree of limitation alleged.  (R. 25).  The ALJ noted that Eaton lived alone, did his own household chores, prepared meals, did laundry once a week, changed sheets, took care of personal needs, and grocery shopped three times a week.  (R. 25; R. 52–60, 159–66, 182–89).

The regulations specifically authorize the ALJ to consider whether a claimant's alleged symptoms are consistent with the claimant's activities of daily living.  20 C.F.R. §§ 404.1529(a)

and (c)(3)(i), 416.929(a) and (c)(3)(i); *see also Johnson*, 434 F.3d at 658 (finding that claimant's

allegations of excruciating pain and inability to perform regular movements were inconsistent

with the claimant's regular church attendance, management of household finances, cooking,

cleaning, reading, clothes washing, and visitation with relatives); *Gross v. Heckler,* 785 F.2d

1163, 1166 (4th Cir. 1986) (upholding a finding of no disability where claimant managed his

household, grocery shopped, cooked, washed dishes, and walked to town every day).

     Eaton claims that the ALJ put a "significant gloss" on Eaton's daily activities in

determining that they were inconsistent with Eaton's testimony about his limitations.  (ECF No.

14 at 12).  To support his claim, Eaton cites testimony alleging that he can only clean his

apartment on good days at his own pace, does not have energy to cook, lets his daughter vacuum

the apartment, and cannot perform additional tasks on laundry days.  (R. 52–54, 57).  However,

the ALJ did recognize qualifications in Eaton's testimony about his daily activities, including

testimony that Eaton's daughter accompanied him to the grocery store and Eaton could become

dizzy and lightheaded when grocery shopping. (R. 25; R. 53–54).

     Though the ALJ noted qualifications in Eaton's testimony, the ALJ properly concluded

that Eaton's testimony regarding the severity of his limitations was not fully credible.  Eaton's

ability to consistently care for himself while living alone and perform household chores was

inconsistent with testimony that Eaton was constantly short of breath upon even minimal

exertion.  (R. 25).

### 3. Non-Compliance with Medical Treatment

     The ALJ inferred that Eaton's failure to keep appointments with his cardiologist and

obtain required blood work suggested that "the symptoms may not have been as limiting as the

claimant has alleged."  (R. 25).  Examples of non-compliance cited by the ALJ included a

December 5, 2008 note from Mid-Atlantic Cardiovascular Associates, indicating that Eaton had been non-compliant with blood work and follow-up visits with Dr. Milak, and records indicating that Eaton had appeared for only one of the six appointments scheduled with Dr. Milak between December 2007 and December 2008.  (R. 25; R. 326–32).  When the ALJ asked Eaton to explain such non-compliance, Eaton first stated that he began seeing a new cardiologist, Dr. Rinehart, following a 2002 stent replacement.  When the ALJ asked for further explanation, Eaton claimed that he failed to follow-up with Dr. Milak between December 2007 and December 2008 because he saw Dr. Biondo instead.  (R. 67).

The regulations authorize the ALJ to consider whether a claimant's alleged symptoms, including pain, are consistent with the treatment received to relieve symptoms.  20 C.F.R. §§ 404.1529(a) and (c)(3)(iv) to (vi), 416.929(a) and (c)(3)(iv) to (vi).  If the alleged severity of the symptoms is inconsistent with the frequency and level of medical treatment received—and the claimant does not provide "good reasons" for failing to seek treatment comparable to the pain alleged—the ALJ may conclude that the claimant's statements about the severity of his symptoms are not fully credible.  SSR 96-7P, at *7; *see also Mickles*, 29 F.3d at 921, 930 (upholding the ALJ's credibility determination based on, *inter alia*, the inconsistency between the claimant's allegations of constant pain and her failure to see a doctor for more than a year); *Culotta v. Astrue*, SAG-10-CV-3137, 2011 WL 6300585, at * 7 (D. Md. Dec. 15, 2011) (holding that the ALJ did not err in considering the claimant's history of non-compliance when evaluating the credibility of her testimony).

In the present case, the ALJ properly concluded that Eaton's failure to seek appropriate blood work and follow-up with Dr. Milak suggested that Eaton's symptoms were not as serious as alleged.  As noted by the ALJ, Eaton's claim that he was constantly short of breath and short

of breath on minimal exertion was inconsistent with Eaton's failure to pursue specialized cardiac care.  (R. 25).  When asked to clarify the inconsistency, Eaton made irrelevant comments about a cardiologist he saw in 2002 instead of explaining why he neglected appointments with Dr. Milak, whom he first saw in March 2007.  Upon further questioning, Eaton suggested that he did not need to see a cardiologist because he received adequate care from his primary care physician, Dr. Biondo.  (R. 67).  Eaton's decision to forgo care from a cardiologist—the specialist most suited to treat his alleged symptoms[14]—suggests that Eaton's shortness of breath, chest pain, and other symptoms were not as serious as alleged.  Since Eaton failed to provide "good reasons" for his non-compliance, the ALJ was entitled to conclude that Eaton's testimony was not fully credible.

### C.  The ALJ Properly Relied on the Vocational Expert's Testimony

Eaton contends that the ALJ's determination that he could perform past work as a security guard (as actually and generally performed) or an auto parts driver (as actually performed), is not supported by substantial evidence because the ALJ relied on flawed vocational expert (VE) testimony.  In particular, Eaton claims that the ALJ relied upon the VE's answer to a hypothetical question that did not consider all of Eaton's impairments.  Eaton avers that the ALJ should have based the hypothetical question on the limitations described in the Questionnaires completed by Dr. Biondo (209–216, 345–52, 510–15) instead of the limitations found in the RFC assessments rendered July 17, 2008 and March 3, 2009 (R. 313–20, 337–44).

The vocational expert's testimony must be based on a consideration of all the evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments.  *English v. Shalala,* 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989).  The ALJ has "great latitude" in formulating

---

[14] The ALJ specifically noted that Eaton was referred to a cardiologist for follow-up with coronary artery disease.  (R. 26; R. 333–34; R. 381–82, 526–27).

hypothetical questions, and is free to accept or reject restrictions to the hypothetical proposed by claimant's counsel. *France v. Apfel,* 87 F. Supp. 2d 484, 490 (D. Md. 2000) (citing *Koonce v. Apfel,* No. 98-1144, 1999 WL 7864, at \*5 (4th Cir. Jan.11, 1999)).

The ALJ may also exclude from the hypothetical opinions he does not credit[15] and need not include all limitations for which there is evidence. *Kearse v. Massanari,* 73 Fed. App'x. 601, 604 (4th Cir. 2003); *English*, 10 F.3d at 1085.  A hypothetical question is unimpeachable if it "adequately reflect[s]" a residual functional capacity for which the ALJ had sufficient evidence. *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006); *Johnson,* 434 F.3d at 659.

In this case, the ALJ's hypotheticals were proper because they fairly set out, in the ALJ's view, all of Eaton's impairments. *See, e.g., Walker*, 889 F.2d at 50–51.  The ALJ's hypotheticals assumed an individual with the same age, education, and past work experience as Eaton.  In the first hypothetical, the ALJ asked the VE to assume that this individual also had the RFC described by Dr. Biddison (R. 337–44), namely the ability to lift twenty pounds occasionally or ten pounds frequently, ability to stand and/or walk about six hours in an eight-hour work-day, sit about six hours in an eight-hour work-day, ability to perform unlimited pushing or pulling, ability to occasionally climb, and ability to frequently balance, stoop, kneel, crouch and crawl.  No manipulative, visual, environmental, or communicative limitations were indicated.  (R. 65).  In the second hypothetical, the ALJ asked the VE to assume that the individual had the RFC described by Dr. Nakhuda (R. 313–20).  (R. 65).  The limitations incorporated in the second hypothetical were identical to the first except that the individual in the second hypothetical could only occasionally balance, stoop, kneel, crouch, or crawl.  (R. 315).  The VE determined that an individual with the abilities described in either hypothetical could perform work as a security

---

[15] Though medical opinions from treating sources are usually entitled to great weight, the ALJ may exclude from the hypothetical medical opinions he does not credit.  *See e.g. Richardson v. Astrue*, 2011 WL 3880406, \* 6 (D. Md. Aug. 31, 2011); *Catir v. Astrue*, CIV. SKG-09-2325, 2011 WL 1599288, at \*10 (D. Md. Apr. 27, 2011).

guard (as actually performed by Eaton and generally performed) or an auto parts driver (as Eaton actually performed it).  (R. 65).

These hypothetical questions accurately reflected Eaton's limitations, based on substantial evidence in the record.  As previously discussed, substantial evidence supports the great weight given to Drs. Barrish and Biddison's opinions, and the ALJ was entitled to reject Dr. Biondo's opinion because it was internally inconsistent, inconsistent with Dr. Biondo's own treatment notes, and inconsistent with the remainder of the medical evidence. Because the ALJ did not credit Dr. Biondo's opinion, he did not have to include the limitations described by Dr. Biondo in the hypothetical posed to the VE.[16]  As such, the VE's testimony is supported by substantial evidence and the ALJ's determination is upheld.

## V.   **Conclusion.**

For the foregoing reasons, Eaton's motions for summary judgment and remand will be denied, and the Commissioner's motion for summary judgment will be granted.  A separate Order will follow.

Date:  August 3, 2012__                                    _____/S/_____
                                                                       JILLYN K. SCHULZE
                                                                       United States Magistrate Judge

---

[16] Eaton's counsel asked the VE to assume a hypothetical individual with Eaton's age, education, and vocational background. Counsel further instructed the VE to assume that this individual had the limitations described in Dr. Biondo's Multiple Impairment Questionnaire (R. 345–52) , including the inability to sit, stand, or walk for more than an hour out of an eight-hour work day.  (R. 66).  The VE determined that such an individual could not perform work as a security guard or auto parts driver. (R. 66).  The VE further determined that such an individual could not obtain other work in the general labor market.  (R. 66). Accordingly, had the ALJ relied on the VE's answer to a hypothetical question incorporating the limitations described by Dr. Biondo, he would have determined that Eaton could not perform past relevant work at step 4 and would have been declared Eaton disabled at step 5.